UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

JOSHUA POWELL,

Plaintiff,

v. CASE NO. 8:22-cv-577-SDM-AEP

PINELLAS COUNTY,

Defendant.
___________________________________/

**ORDER**

Diagnosed with Human Immunodeficiency Virus and requiring periodic medical attention "to stay alive," Joshua Powell claims in a one-count complaint under the Americans with Disabilities Act that his former employer, Pinellas County, fired Powell for attending medical appointments during his shift. Moving (Doc. 38) for summary judgment, Pinellas County argues that Powell frequently missed work without informing his supervisor despite a warning that his employment was "in jeopardy." Powell responds (Doc. 47) in opposition and represents that "any work he missed was for legitimate medical reasons and approved" and that discriminatory animus "infected" his termination.

## BACKGROUND[1]

Diagnosed with HIV, Powell requires regular consultation with a physician and occasional dental procedures to limit the risk of infection. (Doc. 35-1 at 18:10–15) Powell testifies that his HIV, however, limits none of his daily functioning, such as "seeing, speaking, walking, eating, or sleeping." (Doc. 35-1 at 18:5–19:2)

In August 2020, Pinellas County hired Powell — subject to a year of probation — to serve as a horticulture specialist in the Florida Botanical Gardens. (Doc. 35-3 at 31) Powell's application mentioned no medical condition but disclosed that he required assistance to lift more than sixteen pounds and that scheduled medical appointments required his attendance. (Doc. 35-3 at 31) At a time he cannot recall, Powell informed his supervisor, Kathryn Barile, Chief Park Ranger, about his HIV diagnosis.[2] (Doc. 35-1 at 19:5–16) Barile assured Powell that attending his medical appointments, necessary to ameliorate the symptoms of his HIV, "would not be an issue." (Doc. 35-1 at 9:11–20)

Under Pinellas County's personnel rules, an employee must use a personal day, a personal holiday, or annual leave to attend a medical appointment or to miss work for any other personal reason. (Doc. 32-2 at 23–26) Further, the personnel

---

[1] The following facts, construed in the light most favorable to Powell, are either undisputed or resolved in Powell's favor.

[2] Barile and Powell's other supervisors testify that Powell informed them about his need to attend medical appointments but never disclosed his HIV diagnosis. (Doc. 34-1 at 2 ¶ 9) On summary judgment, this dispute about his employer's knowledge of his disability—a requirement to sue for discrimination under the ADA—is resolved in Powell's favor.

rules warn that any leave "not requested and approved . . . will be considered unscheduled and may result in disciplinary action." (Doc. 32-2 at 25)

Powell's shift began each weekday at 7:00 a.m. (Doc. 34-1 ¶ 5) Because Powell's daily responsibility included supervising a spray technician and the garden's daily batch of volunteers, Powell's timely arrival was an essential function of his employment. (Doc. 34-1 ¶ 6) From August through mid-October, Powell requested scheduled leave on five occasions. (Doc. 33-2 at 1–2) Barile never denied any request for scheduled leave.[3] (Doc. 34-1 ¶ 18) Powell's payroll records reveal, however, that from mid-October through mid-December Powell used unscheduled leave, that is, leave without pre-approval, on six occasions.[4] (Doc. 33-2 at 2–3) In Powell's end-of-year performance report, Barile comments favorably on Powell's "problem solving" but remarks that Barile and Powell "have spoken on multiple occasions on the importance of arriving to work on time" and that Powell "needs to communicate better with [Barile] regarding planned time off for various appointments[,] etc." (Doc. 34-2 at 2) Barile testifies that she counseled Powell that "it was vital he arrive to work on time for his 7:00 AM – 3:30 PM shift" and that Powell "said he

[3] Powell testifies that on one occasion Barile failed to respond to Powell's text message requesting leave to attend an appointment. (Doc. 35 1 at 23:19–24:9) Nothing in the record suggests that Powell was denied leave to attend this appointment or that Powell was disciplined for attending this appointment.

[4] In addition to these six instances of unscheduled leave, Barile testifies that on three occasions in November 2020 Powell arrived late for personal reasons unrelated to his HIV. (Doc. 34-1 ¶¶ 22–24) But Powell testifies that he "does not recall" any of these occasions; cites his payroll record, which reveals a "Regular Time Entry" for each of these three occasions; and cites Barile's testimony that any unapproved tardiness "would be counted as unscheduled leave" on his payroll record. Accordingly, Powell genuinely disputes whether he arrived late on these three occasions in November 2020.

understood and apologized." (Doc. 34-1 ¶ 25) Powell presents no challenge to the authenticity of this report but testifies that Barile never counseled Powell about the report. Accordingly, this order assumes that Barile prepared the report but never counseled Powell about the report.[5] (Doc. 35-1 at 20:10–14)

On December 31, 2020, Powell overslept and arrived an hour late. (Doc. 34-1 ¶ 26) Because Powell failed to inform Barile to expect his late arrival, the spray technician and volunteers waited idly for Powell's instruction. (Doc. 34-1 ¶ 26) Later that day, Barile cautioned Powell that his probationary employment was "in jeopardy due to his unscheduled tardiness" and asked Powell "how he can supervise the spray technician [and the volunteers] if he could not arrive on time to meet them." (Doc. 34-1 ¶ 28) Barile told Powell to "do some soul searching over the holiday" to "see if he really wanted to be a part of this team and be able to commit himself" and remarked that Powell "spent a lot of time going to medical treatment instead of wanting to work." (Doc. 36-1 at 3)

On January 8, 2021, Powell overslept, arrived two hours late, and failed to inform Barile to expect his late arrival. (Doc. 34-1 ¶ 29) As a probationary employee, Powell was subject to dismissal "at any time prior to the expiration of the probationary period." (Doc. 32-2 at 5) After Powell arrived two hours late, Barile informed

[5] Specifically, in response to the question, "Do you recall having a performance review in December of 2020," Powell testified during his deposition, "Absolutely not." Whether a failure to recall an event amounts to a denial that an event occurred—particularly if the opponent presents testimony that the event in fact occurred—depends on the context of the denial. *Tinder v. Pinkerton Security*, 305 F.3d 728, 735–36 (7th Cir. 2002). In this instance, the phrasing of the denial—"Absolutely not"—fairly conveys that (according to Powell) the performance review never occurred.

her supervisor, the operations manager, about Powell's recurrent, unscheduled tardiness. (Doc. 34-1 ¶ 30) The same day, the operations manager decided that Powell had failed to satisfy the minimum standard of a probationary employee and met with the park director, who signed a letter terminating Powell's probationary employment. (Doc. 31-1 ¶¶ 8–9) Powell testifies that his termination "was out of [the] blue" and sues under the ADA. (Doc. 35-1 at 22:17–22)

## DISCUSSION

Generously construed, Powell's complaint and opposition to summary judgment presents under the ADA two claims of "discrimination" — failure to accommodate and intentional discrimination. Also, Powell's opposition to summary judgment (but not his complaint) appears to claim retaliation under the ADA.

### A. Discrimination under the ADA

The prohibition against disability discrimination, codified in 42 U.S.C. § 12112(a), states, "No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." In other words, Powell must present a genuine issue of fact (1) that he has a "disability," (2) that he is a "qualified individual," and (3) that he was "discriminated against because of his disability." *Beasley v. O'Reilly Auto Parts*, 69 F.4th 744, 754 (11th Cir. 2023).

1. Disability

Under 42 U.S.C. § 12102(1), "disability" means "a physical or mental impairment that substantially limits one or more major life activities of such individual[.]" Section 12102(2)(B) defines "major life activities" to include a major bodily function. Although no party disputes that Powell's HIV infection constitutes a "physical impairment," the parties dispute whether Powell's HIV infection "substantially limits one or more major life activities."

Declining to address whether an HIV infection amounts to a *per se* disability under the ADA, *Bragdon v. Abbot*, 524 U.S. 624, 641–42 (1988), reasons that even without the development of AIDS an HIV infection "substantially limits" the ability of a woman to bear children, a "major life activity" under the ADA. Some decisions interpret *Bragdon* as announcing a rule that HIV is a *per se* disability. For instance, *Doe v. Dekalb County School District*, 145 F.3d 1441, 1445 n.5 (11th Cir. 1998), remarks that "[a] person who is infected with HIV is 'disabled' for purposes of the ADA, even if he has not developed AIDS." *Dekalb*, 145 F.3d at 1445 n.5 (citing *Bragdon*).

After *Bragdon* and *Dekalb*, a series of Supreme Court decisions emphasized that the analysis of "disability" under the ADA requires an "individualized inquiry." *See, e.g.*, *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 566 (1999); *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 483 (1999); *Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184, 199 (2002). Studying the "individualized" inquiry required by these decisions, *Waddell v. Valley Forge Dental Associates, Inc.*, 276 F.3d 1275, 1279 n.4 (11th Cir. 2001), reasons that neither *Bragdon* nor *Dekalb* establishes a *per se* rule that HIV

amounts to a disability. Thus, although HIV constitutes a "physical impairment," a plaintiff infected with HIV must demonstrate that the plaintiff's HIV substantially limits a major life activity. *Waddell*, 276 F.3d at 1279 n.4.

In 2008, Congress found that the "individualized inquiry" of *Sutton* and *Toyota* imposed an "inappropriately high level of limitation necessary to obtain coverage under the ADA" and enacted the Americans with Disabilities Amendments Act to "[reinstate] a broad scope of protection." Pub. L. No. 110–325, 122 Stat. 3553 (2008). The legislative findings of the ADAAA instruct that "the question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis." PL 110–325.[6]

Among other things, the ADAAA in Section 12102(2)(B) expands the definition of "major bodily functions" to include the "functions of the immune system." Also, the ADAAA in Section 12102(4)(D) expands "disability" to include "an impairment that is episodic or in remission . . . if it would substantially limit a major life activity when active." Further, the ADAAA in Section 12102(4)(E) instructs that "whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures such as . . . medication." Although broadening the scope of "major life activity," the ADA (as amended by the

---

[6] The ADAAA "was adopted to specifically address certain impairments that were not receiving the protection that Congress intended—cancer, HIV–AIDS, epilepsy, diabetes, multiple sclerosis, amputated and partially amputated limbs, post-traumatic stress disorder, intellectual and developmental disabilities—not minor, transitory impairments, except if of such a severe nature that one could not avoid considering them disabilities." *Koller v. Riley Riper Hollin & Colagreco*, 850 F. Supp. 2d 502 (E.D. Pa. 2012) (citing 154 Cong. Rec. H8286 (2008) (statement of Rep. George Miller)).

ADAAA) establishes no *per se* rule that HIV (or any other impairment) amounts to a disability. Thus, *Waddell*'s rejection of HIV as a *per se* disability remains in effect. Accordingly, Powell must show that a reasonable fact finder could conclude that his HIV "substantially limits a major life activity" in the absence of ameliorative treatment.

Powell concedes that his HIV infection, ameliorated by antiretroviral medication, imposes no limit on his "seeing, speaking, walking, eating, or sleeping." But Powell testifies that without regular treatment, his HIV, which compromises his immune system, would result in rapid deterioration of his health and jeopardize his ability "to stay alive." And despite the ameliorative effect of his medication, Powell requires extensive oral surgery to reduce the risk to his health of oral infection and from the attendant sequelae. Pinellas County identifies nothing in the record suggesting that Powell's HIV — "without regard to the ameliorative effects of mitigating measures" — fails to substantially limit a major life activity. Although Powell appends no medical report to reinforce his testimony, a reasonable fact finder could conclude that Powell's need for regular medical attention and Powell's testimony about the consequences of a lack of treatment yield an inference that his HIV "substantially limits" the functioning of his immune system, a "major life activity" under the ADA (as amended by the ADAAA).[7] *See, e.g.*, *Rodriguez-Alvarez v. Diaz*, 2017

[7] Because the ADA (as amended by the ADAAA) defines "major life activity" to include "the functioning of the immune system" and because the ADA disregards the ameliorative effects of medication, a careful reader might observe that HIV appears to approach the status of a *per se* disability under the ADA. Even under the ADAAA, however, a plaintiff infected with HIV cannot rely

(continued…)

WL 66052 (D.P.R. 2017); *Roggenbach v. Touro Coll. of Osteopathic Med.*, 7 F. Supp. 3d 338 (S.D.N.Y. 2014); *Lundy v. Phillips Staffing*, 2014 WL 811544 (D.S.C. 2014); *Alexiadis v. New York Coll. of Health Pros.*, 891 F. Supp. 2d 418 (E.D.N.Y. 2012).

2. Qualified individual

Under 42 U.S.C. § 12111(8), "qualified individual" means someone who "with or without reasonable accommodation, can perform the essential functions of the employment position[.]" "'Essential functions' are the fundamental job duties of a position that an individual with a disability is actually required to perform." *Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1365 (11th Cir. 2000). To determine whether a duty is essential, "consideration [is] given to the employer's judgment," including that judgment as expressed in a "written job description." *Earl*, 207 F.3d at 1365. No party disputes that — with medication — Powell's HIV impedes none of his ability to perform the essential functions of his employment or that, because the spray technician and the volunteers require Powell's instruction each morning, Powell's punctual arrival at 7:00 a.m. is an "essential function" of his employment.

Pinellas County argues that Powell's history of arriving late without requesting permission from his supervisor and of attending medical appointments without requesting permission from his supervisor prevents Powell's performing the essential functions of his employment. An employee's ability to "perform the essential functions of the employment position" encompasses not only a limitation attending the

solely on the fact of the diagnosis and must produce evidence showing that in the absence of medication the HIV would substantially impair the plaintiff's immune system.

plaintiff's disability but also any other limitation. *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 862 (7th Cir. 2005). In other words, an employee is not a "qualified individual" if "for reasons unrelated to his disability (such as a poor work ethic, carelessness, bad attitude, insubordination or unprofessional demeanor)" the employee is "not qualified for the job or is unable to perform the job's essential functions or fulfill the requirements of the position as prescribed by the employer or 'fails to meet his employer's expectations.'" *Hammel*, 407 F.3d at 862. Absent an unusual circumstance, predictable attendance constitutes an "essential function" of any employment. *Ryerson v. Jefferson Cnty. Comm'n*, 2020 WL 6701797 (N.D. Ala. 2020), *aff'd*, 2021 WL 3629906 (11th Cir. 2021) (collecting cases).

The record reveals no dispute that Powell is "unable to perform the job's essential functions" for "reasons unrelated to his disability." Within the first few months of his employment, Powell on at least six occasions took unscheduled leave, and his supervisor prepared a contemporaneous performance report commenting on Powell's unacceptable tardiness and absenteeism. On December 31, 2020, Powell overslept, arrived more than an hour late without informing his employer, and received a warning that his employment was "in jeopardy." A week after this warning, Powell again overslept, arrived more than two hours late, and received a termination letter three days later.

Nothing in the record genuinely disputes these facts. Four times in his opposition to summary judgment, however, Powell represents that "any work he missed was for legitimate medical reasons and approved." (Doc. 47 at 15) To support this

representation, Powell first cites his testimony during a deposition that on unspecified days he had "four different oral procedures that needed to be done," "a back procedure that needed to be done," and "multiple blood draws and visits[.]" (Doc. 47 at 15) (citing Doc. 35-1 at 23:8–13) Although some of Powell's absences might have resulted from a legitimate medical reason, nothing in the record suggests that every absence resulted from a legitimate medical reason or that for each absence Powell notified his supervisor before taking leave. Second, Powell cites his testimony disputing Barile's testimony that Powell arrived late on three occasions in November 2020. (Doc. 47 at 15) (citing Doc. 35-1 at 20:19–21:5) Although Powell genuinely disputes a minority of the instances for which Pinellas County claims that Powell arrived late, nothing in the record disputes the remaining instances in which Powell arrived late. Thus, Powell demonstrates a genuine dispute about his unapproved tardiness on a few occasions but not a material dispute about his tendency for unscheduled tardiness. Third, Powell cites his interrogatory testimony in which he alleges that Barile remarked that Powell "spent a lot of time going to medical treatment instead of wanting to work." (Doc. 47 at 3) (citing Doc. 36-1 at 3) Again, testimony that Powell missed work sometimes to attend medical appointments is not testimony that Powell missed work only to attend medical appointments. The record fails to substantiate Powell's universal declaration that "any work he missed was for legitimate medical reasons and approved."

Because the record reveals no dispute that Powell's punctual arrival was an essential function of his employment and because Powell repeatedly arrived late

without informing his supervisor, Pinellas County demonstrates that Powell was unable (or unwilling) to perform an essential function of his employment. Accordingly, Pinellas County demonstrates no genuine dispute that Powell lacks the status of a "qualified individual" under the ADA.

3. Discrimination on the basis of disability

Although Powell lacks the status of a "qualified individual" under the ADA, this order for the sake of completeness assesses each of his bases for claiming "discrimination" under the ADA.

*a. Failure to accommodate*

An employer discriminates on the basis of disability if the employer fails to "reasonably accommodate" a disabled employee to perform the "essential functions" of the job unless the proposed accommodation subjects the employer to "undue hardship." *Beasley v. O'Reilly Auto Parts*, 69 F.4th 744, 754 (11th Cir. 2023) (citing *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1255 (11th Cir. 2001)). The ADA "does not mandate a pretermination investigation" by the employer into the possibility of a reasonable accommodation, *Moses v. Am. Nonwovens, Inc.*, 97 F.3d 446, 448 (11th Cir. 1996), and "[t]he plaintiff bears the burden of identifying an accommodation and showing that the accommodation would allow him to perform the essential functions of the job in question," *Boyle v. City of Pell City*, 866 F.3d 1280, 1289 (11th Cir. 2017) (citing *Lucas*, 257 F.3d at 1255–56).

Powell maintains that "the resolution of this case turns on whether the leave Plaintiff took was a reasonable accommodation that [Pinellas County] should have

afforded him." (Doc. 47 at 13) But Powell, who bears the burden to identify the reasonable accommodation that he requested and his employer denied, presents no coherent statement of the accommodation that Pinellas County allegedly failed to afford him. Of course, Pinellas County promptly accommodated Powell by assuring that attending his medical appointments "would not be an issue." And Powell identifies no instance in which Pinellas County refused a request to attend a medical appointment or disciplined Powell for attending or requesting leave to attend a medical appointment. Powell complains that he was required to "use[] [his] own sick time or PTO to be able to miss work." (Doc. 36-1 at 3) But embedded in this complaint is the concession that Pinellas County's personnel rules afforded Powell a mechanism to attend a medical appointment. Although the ADA might require an employer to reasonably accommodate a disabled employee by granting leave in excess of the default leave policy, *Holly v. Clairson Indus.*, L.L.C., 492 F.3d 1247, 1263 (11th Cir. 2007), Powell cites nothing to suggest that he requested leave in excess of the default leave policy (or that Pinellas County denied a request to attend a medical appointment because Powell exceeded the leave policy).

Also, Powell suggests that Pinellas County should have exempted all his medical leave from counting against the default leave policy. (Doc. 47 at 14) The record includes no suggestion that Powell requested this accommodation. In any event, an accommodation exempting medical leave from Pinellas County's leave policy is facially unreasonable.

Finally, Powell implies that a "good faith interactive process" should have yielded a flexible schedule allowing Powell to arrive late and apparently without advance notice to his supervisor. Although in a rare circumstance the ADA might require an accommodation permitting a disabled employee to arrive late without notice (such as an employer suffering from a sudden and unexpected event, such as a seizure, that prevented notice), a scheduled medical appointment is — by definition — a predictable event that allows easy notice to the employer. Nothing in the record suggests that Powell's HIV required unanticipated or emergency treatment or that Powell's HIV resulted in sudden and unpredictable bouts of debilitation preventing his timely arrival. To permit Powell to attend a scheduled medical appointment during his shift without notifying his supervisor is likewise facially unreasonable.

Also, Powell fails to show a causal connection between the lack of an accommodation and his termination. *Beasley v. O'Reilly Auto Parts*, 69 F.4th 744, 754 (11th Cir. 2023) (observing that the failure to accommodate must "negatively impact the employee's . . . discharge.") The record reveals no dispute that Powell was fired for arriving late without informing his supervisor — not for attending medical appointments. Powell's claim for failure to accommodate fails.

*b. Intentional discrimination*

Although inadequately presented in his complaint and in his opposition to summary judgment, Powell contends that Barile was motivated by discriminatory animus in recommending Powell's termination. Powell cites no direct evidence, such as a disparaging remark about his HIV diagnosis, suggesting that Barile (or any

other superior) harbored an animus against Powell because of his HIV. Instead, Powell argues that, because Pinellas County "freely admits" to firing Powell for missing work and because Powell on occasion missed work to attend a medical appointment and to receive treatment for his HIV, Pinellas County must have fired Powell "because of his disability." (Doc. 47 at 13) But this "admission" acknowledges the obvious: Pinellas County fired Powell for arriving late — not for having HIV.

Lacking direct evidence of intentional discrimination, Powell relies on *McDonnell Douglas* to present a prima facie case of intentional discrimination. But Powell's prima facie case fails because Powell identifies no similarly situated employee treated more favorably. In any event, Pinellas County presents a legitimate, non-discriminatory reason, supported by contemporaneous reports and warnings that Powell's recurrent, unscheduled tardiness placed his employment "in jeopardy." Powell cites nothing in the record to suggest that this explanation serves as a pretext to conceal a discriminatory animus against his disability. At best, Powell cites Barile's remark that Powell "spent a lot of time going to medical treatment instead of wanting to work." Construed in the light most favorable to Powell, this statement implies that Barile had grown weary in response to the frequency of Powell's medical appointments. But a reasonable fact finder cannot conclude that this mildly sardonic statement demonstrates that Pinellas County's well-documented and robustly supported explanation — Powell's recurrent, unscheduled tardiness — serves as a pretext for intentional disability discrimination against a probationary employee.

Finally, Powell alludes to *Lockheed-Martin* to suggest that a "convincing mosaic of circumstantial evidence" reveals intentional discrimination. But Powell cites no circumstantial evidence purportedly revealing a "convincing mosaic" of discrimination. Nothing in the record — whether considered singly or collectively — suggests that Pinellas County terminated his probationary employment because of his HIV diagnosis and not for repeatedly arriving late without informing his supervisor. Powell's claim for intentional discrimination fails.

B. Retaliation

Although not expressly claiming that Pinellas County retaliated against Powell for attending his medical appointments, Powell's opposition to summary judgment discusses several decisions analyzing retaliation and asserts that Pinellas County served as Barile's "cat's paw" to conceal a retaliatory motive. But Powell's one-count complaint asserts no claim for retaliation, which arises under a different section of the ADA than his claim for disability discrimination. Thus, this claim (assuming Powell intended to pursue it) is waived. In any event, the claim fails on the merits. Although Powell need not prove a "disability" or that he is a "qualified individual" to claim retaliation under the ADA, Powell cannot overcome Pinellas County's legitimate, non-discriminatory explanation for his termination. The record reveals no dispute that Pinellas County fired Powell for repeatedly arriving late without informing his supervisor — not for attending his medical appointments.

## CONCLUSION

Belied by the record, Powell's claim under the ADA fails. Pinellas County's motion (Doc. 38) for summary judgment is **GRANTED**. The clerk must (1) enter judgment for Pinellas County and against Joshua Powell and (2) close the case.

ORDERED in Tampa, Florida, on July 10, 2023.

STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE